**BRYAN WALSH, N.D.**            *        IN THE UNITED STATES
2696 Walston Road
Mount Airy, MD 21771            *        DISTRICT COURT FOR THE

     *and*                  *        DISTRICT OF MARYLAND

**THOMAS WOOD, B.M., B.CH., PH.D.**   *
20803 Poplar Way
Lynwood, WA 98036               *        CASE NO.: _____

     v.                    *

**CHRISTOPHER KELLY**           *
151 Bean Creek Road, No. 11
Scotts Valley, CA 95066         *

     *and*                  *

**NOURISH BALANCE THRIVE, INC.**   *
1267 Willis Street, Suite 200
Redding, CA 96001               *

   Serve On:                    *
   Jon Miles, Agent for Service of Process
   Registered Agents, Inc.      *
   560 Haight Street, Suite 104
   San Francisco, CA 94117      *        JURY DEMANDED

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## VERIFIED COMPLAINT

Plaintiffs Bryan Walsh, N.D. ("Dr. Walsh") and Thomas Wood, B.M., B.Ch., Ph.D. ("Dr. Wood") hereby file this Verified Complaint against Defendants Christopher Kelly and Nourish Balance Thrive, Inc., seeking damages, specific performance, and injunctive relief.

## PARTIES

1.      Plaintiff Bryan Walsh, N.D. is an individual domiciled in Maryland.

2.      Plaintiff Thomas Wood, B.M., B.Ch., Ph.D., is an individual domiciled in Washington.

3.      Defendant Christopher Kelly is an individual domiciled in California.

4.      Defendant Nourish Balance Thrive, Inc. is a corporation registered under the laws of California whose primary place of business is in California.

## JURISDICATION AND VENUE

5.      The jurisdiction of this Court exists pursuant to 28 U.S.C. § 1332, since the damages sought exceed $75,000 and all of the parties are citizens of and/or conduct business in different States.

6.      The venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), because the events or omissions giving rise to the claims contained herein occurred in substantial part in the District of Maryland.

## FACTS

Background

7.      Bryan Walsh, N.D., is a naturopathic physician focusing on human physiology and nutrition.

8.      A significant portion of Dr. Walsh's practice consists of research with a focus on providing practical information that health practitioners can use to help their clients.

9.      As a result, Dr. Walsh frequently communicates and collaborates with non-healthcare professionals in fields that might be able to serve these ends, such as computer science.

10.     Over the years, Dr. Walsh accumulated a large quantity of anonymous blood data (the "Blood Data") from a lab he created for a corporate gym chain, Time Life Fitness.

11.     In or around 2016, Dr. Walsh began to wonder if a statistical analysis of the Blood Data was possible and if such an analysis could further his research goals.

12.     In or around 2016, Dr. Walsh spoke to Mr. Kelly, an acquaintance, about how he might best perform a statistical analysis of his data using computer science.

13.     Dr. Walsh knew that Mr. Kelly founded and ran a company called Nourish Balance Thrive, Inc. ("NBT") which claimed to use biochemical testing to optimize performance in athletes, and thought he may be able to assist in coming up with a use for the Blood Data.

14.     In the course of their conversation, Mr. Kelly and Dr. Walsh discussed new developments in the field of machine learning, *i.e.*, data analysis that allows computers to build analytical, predictive models of phenomena.

15.     Mr. Kelly also suggested that Dr. Walsh send him the Blood Data in order to run experiments with it.

The Initiation of the Partnership

16.     Over the course of the next year-and-a-half, from 2016 to 2017, Dr. Walsh and Mr. Kelly partnered with Thomas Wood, B.M., B.Ch., Ph.D., who worked with NBT and contributed to a podcast hosted by Mr. Kelly, as well as an individual named Megan Roberts, an employee of NBT (collectively, the "Partners").

17.     During that year-and-a-half, the Partners developed a machine learning program, which came to be known as the Blood Chemistry Calculator (the "BCC"), that could use existent blood data to predict certain factors: for example, unmeasured laboratory markers such as the presence of higher-than-normal amounts of lead or mercury (the concept, software, data structuring methods, and any other proprietary information developed by the Partners relating to the BCC is collectively referred to herein as the "BCC IP").

18.     In the early stages of development, Dr. Walsh plugged three sets of data into the BCC and received an accurate prediction as to the existence of other factors not present in the data.

19.     Based on this and other positive results, the Partners viewed the BCC as a "game-changer" in the medical industry.

20.     In December 2017, after continued development of the BCC, the Partners possessed a relatively stable Beta (the "BCC Beta").

21.     The BCC Beta still had certain issues with predictive accuracy and other technological "kinks" that needed to be ironed out, but the Parties felt confident selling it to medical professionals as a work-in-progress.

The Partnership Agreement

22.     On or about December 8, 2017, the Partners' relationship became formalized in an oral agreement (the "Partnership Agreement").

23.     The Partnership Agreement stated that Dr. Walsh would receive 40% of any profits gained from the BCC IP, Mr. Kelly 30%, Dr. Wood 20%, and Ms. Roberts 10%.

24.     The Partnership Agreement also provided that the Partners would develop any intellectual property regarding the BCC together, share such IP amongst themselves, and that the Partners would confer with each other before making any decisions regarding the marketing and sale of the BCC or its IP.

25.     Finally, the Partnership Agreement stated that all sales and marketing of the BCC were to be conducted via NBT as a temporary measure, and that the Partners would move operations into the control of an independent corporate entity after the product moved past the initial stage of development.

26.     This final provision came at the suggestion of Mr. Kelly, who told the other Partners that doing business through NBT would expedite the development and the sale of the BCC in its early stages.

27.     Through NBT, the Partners made approximately eight-thousand ($8,000) dollars per month in revenue selling the BCC Beta.

28.     The Partners filled out IRS 1099 (independent contractor) forms and provided them to Mr. Kelly/NBT in order to receive these funds.

29.     In the course of developing the BCC, Mr. Kelly conducted the largest proportion of business with Dr. Walsh in Maryland via his Maryland telephone number, as well as through emails sent to Dr. Walsh at his Maryland residence.

30.     Moreover, of the Partners, Dr. Walsh received the most substantial portion of the BCC profits (40%), and deposited these profits into a Maryland bank account.

The Start of Mr. Kelly's Machinations

31.     Dr. Wood was concerned about the aforementioned kinks in the BCC Beta, and the reliability of the predictions provided by the BCC. He felt that it was necessary to make the BCC Beta more robust before advertising it.

32.     Dr. Walsh and Dr. Wood were also discomforted by the fact that their partnership with Mr. Kelly was not memorialized in an executed, written agreement, and that the BCC Beta was being sold through NBT and not a separate business entity.

33.     Consequently, Dr. Walsh and Dr. Wood resolved to create an LLC in order to sell the BCC and formalize the Partnership Agreement in writing.

34.     The LLC was filed in Wyoming on April 25, 2019 as "Blood Chemistry Calculator, LLC" (Filing ID No. 2019-000853092, the "Wyoming LLC").

35.     As part of the Wyoming LLC's creation, Dr. Walsh prepared an operating agreement (the "Operating Agreement"), which he sent to Mr. Kelly to sign. *See* Ex. 1 (Operating Agreement).

36.     Mr. Kelly refused to sign the Operating Agreement, telling the other Partners that he did not "speak legalese."

37.     By this point, Dr. Walsh and Dr. Wood were suspicious of Mr. Kelly's motives and, at the very least, his business acumen.

38.     The Partners were spread out around the United States (Dr. Wood works and lives in Washington, Mr. Kelly operates out of Silicon Valley, California, Ms. Roberts lives in Colorado, and Dr. Walsh is in Maryland), so they could not keep a watchful eye on Mr. Kelly's actions.

39.     Without warning, shortly after the Wyoming LLC was registered, Mr. Kelly approached the other Partners and suggested they move out to Silicon Valley for six months to secure venture capital funding for the BCC and work to develop it further.

40.     When Dr. Walsh and Dr. Wood explained to him that they could not do that, Mr. Kelly grew irate and threatened to dissolve the Partnership Agreement.

Mr. Kelly Takes the BCC IP and Goes Silent

41.     Dr. Walsh and Dr. Wood became concerned about the impact the dissolution of the Partnership Agreement (and, by extension, the Wyoming LLC) would have on all of the BCC IP the Partners worked to develop.

42.     As a result of these concerns, Dr. Wood told Mr. Kelly that the Partners would accede to the dissolution only if Mr. Kelly agreed not to use any of the BCC IP.

43.     Mr. Kelly then went largely incommunicado.

44.     In particular, Mr. Kelly stopped responding to the Partners' requests to sign a dissolution agreement – or any correspondence relating to the BCC.

Mr. Kelly Begins to Market and Sell His Own BCC-Type Product

45.     In late 2019, Dr. Walsh was approached by a former client who asked if he "endorsed" Mr. Kelly's "new" version of the BCC, which Mr. Kelly was marketing to former users of the BCC Beta via email under the name "bloodsmart.ai" ("Bloodsmart").

46.     Upon reviewing NBT's website, Dr. Walsh and Dr. Wood saw a button labeled "Blood Chemistry Calculator" that directed to a new website for Bloodsmart. *See* Ex. 2 (Bloodsmart Website).

47.     Dr. Walsh reviewed a sample report from Bloodsmart's website, and noticed that the data provided in that report was gathered from a sample set of 439 "previous users." *See* Ex. 3 (Sample Report).

48.     Since Bloodsmart was at this point only weeks old, the presence of so many users revealed to Dr. Walsh that Mr. Kelly was – and is – using data from the BCC in his new venture.

49.     Dr. Wood and Dr. Walsh then reached out to NBT using a dummy email account to request information on Bloodsmart.

50.     Upon asking for information about the technology, Dr. Wood and Dr. Walsh received a lengthy response from an NBT staff member stating, in part, that Bloodsmart used "a machine learning algorithm together with blood chemistry data from tens of thousands of people, [to]… make predictions (forecast) the results of tests that either you haven't done or that are unavailable outside a research setting." *See* Ex. 4 (First Dummy Email and Response).

51.     This description of Bloodsmart was nearly identical to that of the BCC that had formerly existed on the internet. *See* Ex. 5 (BCC Website), *cf.* Ex. 2 (Bloodsmart Website).

52.     Dr. Walsh and Dr. Wood then noticed that the BCC website (bloodcalculator.com) was no longer active, and instead redirected to the new Bloodsmart website; neither Dr. Walsh nor Dr. Wood had been notified of this change.

53.     Dr. Walsh and Dr. Wood sent another query to NBT using the dummy email account, this time specifically inquiring about whether Bloodsmart was the same or in any way related to the BCC.

54.     Dr. Walsh and Dr. Wood received a response, from the same NBT staff member, explaining that "there isn't a huge difference between [Bloodsmart] and the previous BCC software. *The idea behind both is the same*, the pricing structure is the same, and *most of the forecasts are the same*." *See* Ex. 6 (Second Dummy Email and Response) (emphasis added).

55.     One of Dr. Walsh's customers, Linda Merlo, sent a similar query to NBT in November 2019, and got a response stating that Bloodsmart and the BCC are "*very similar*. Most of what has changed is the appearance and organizational structure." *See* Ex. 7 (Linda Merlo Email and Response) (emphasis added).

56.     These email exchanges and websites confirmed that Bloodsmart is substantively the same as the BCC, and that that Mr. Kelly had misappropriated the Partners' BCC IP in order to market and sell an identical product in a manner that excluded the Partners, both financially and in the decision-making process.

57.     For the reasons stated in ¶¶ 30-31, *supra*, the most substantial harm arising from Mr. Kelly's actions occurred in the State of Maryland, since the majority of business was conducted between Mr. Kelly/NBT and Dr. Walsh, and Dr. Walsh received the largest allocation of BCC profits per the terms of the Partnership Agreement.

## COUNT I: BREACH OF CONTRACT
### (All Defendants)

58.     Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

59.     The Partnership Agreement entered into by Dr. Walsh, Dr. Wood, Ms. Roberts, and Mr. Kelly, along with his company, Nourish Balance Thrive, Inc., was a valid, enforceable oral agreement.

60.     The Partnership Agreement provided that profits from the sale of the BCC would be split between the Partners, with 40% going to Dr. Walsh, 20% going to Dr. Wood, 30% going to Mr. Kelly, and 10% going to Ms. Roberts.

61.     The Partnership Agreement also provided that the Partners would develop any intellectual property regarding the BCC together, share such IP amongst themselves, and that the Partners would confer with each other before making any decisions regarding the marketing and sale of the BCC or its IP.

62.     Finally, the Partnership Agreement stated that sales and marketing of the BCC were to be conducted via NBT as a temporary measure, and that the Partners would move operations into the control of an independent corporate entity after the product moved past the initial stage of development.

63.     Mr. Kelly and his company, NBT, accepted the terms of the Partnership Agreement and thus owed the Partners a contractual obligation.

64.     Dr. Walsh and Dr. Wood were ready, willing, and able to perform the terms of the Partnership Agreement.

65.     Mr. Kelly's appropriation of the BCC IP for himself, as well as his decision to market a virtually identical product under a different moniker, constitute a material breach of the

terms of the Partnership Agreement on at least four fronts: (1) Mr. Kelly did not move control of the BCC into an independent corporate entity, instead usurping control of the venture for himself; (2) Mr. Kelly stole shared BCC IP that the Partners worked together to develop; (3) in marketing the BCC under a new name, Mr. Kelly took for himself profits that should have been split amongst the Partners; (4) Mr. Kelly deprived Dr. Walsh and Dr. Wood of a role in the decision-making process by unilaterally removing the BCC from the marketplace.

66.     NBT, as Mr. Kelly's company, is also liable for a breach of the Partnership Agreement, since it is the channel through which Bloodsmart is controlled, marketed, and sold.

67.     As a result of Mr. Kelly's/NBT's breach, monetary damages are a necessary but insufficient remedy at law, and equitable relief is needed to restore ownership of the BCC IP and control over the marketing and sale of the BCC to an independent corporate entity controlled by the Partners as a group.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Hold that Defendants Christopher Kelly and Nourish Balance Thrive, Inc., breached the Partnership Agreement.

(2) Grant a judgement against Defendants Christopher Kelly and Nourish Balance Thrive, Inc. in excess of Seventy-Five Thousand Dollars ($75,000) in compensatory and expectation damages, plus interest.

(3) Grant a judgement that the Partnership Agreement be specifically enforced: that Defendants Christopher Kelly and Nourish Balance Thrive, Inc. cease utilizing the BCC IP for their own gain; that they transfer the BCC IP into the control of an independent corporate entity managed by the Partners; and that they terminate their efforts to market and sell Bloodsmart.

(4) Hold Defendants Christopher Kelly and Nourish Balance Thrive, Inc. responsible for the costs of these proceedings, and the attorney's fees accrued by Plaintiffs.

(5) Grant such other and further relief as this Court deems appropriate.

## COUNT II: UNJUST ENRICHMENT
### (All Defendants)

68.     Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

69.     By involving Christopher Kelly and his company, Nourish Balance Thrive, Inc., in the BCC venture, as well as providing Mr. Kelly with the Blood Data and associated BCC IP, Plaintiffs conferred a benefit upon Defendants.

70.     Mr. Kelly and NBT had appreciation and knowledge of this benefit, evinced, among other things, by their willingness to market the BCC and the disbursal, via NBT, of the profits gained selling the BCC.

71.     Mr. Kelly's appropriation of the BCC IP for himself, as well as his decision to market a virtually identical product under a different moniker through NBT, constitute an acceptance and retention of this benefit under such circumstances as to make it inequitable for Mr. Kelly/NBT to retain it without payment of its value or the return of profits gained at the expense of the other Partners.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Hold that Defendants Christopher Kelly and Nourish Balance Thrive, Inc., were unjustly enriched by the BCC venture, including but not limited to the IP that was to be shared amongst the Partners.

(2) Grant a judgement against Defendants Christopher Kelly and Nourish Balance Thrive, Inc. in excess of Seventy-Five Thousand Dollars ($75,000) in compensatory and expectation damages, plus interest.

(3) Hold Defendants Christopher Kelly and Nourish Balance Thrive, Inc. responsible for the costs of these proceedings, and the attorney's fees accrued by Plaintiffs.

(4) Grant such other and further relief as this Court deems appropriate.

## COUNT III: FRAUDULENT MISREPRESENTATION
### (Christopher Kelly)

72.     Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

73.     Defendant Christopher Kelly told the other Partners on or around December 8th, 2017 that selling and marketing of the BCC through NBT was a temporary measure, and that the Partners would move operations into the control of an independent corporate entity after the product moved past the initial stage of development.

74.     Mr. Kelly's statement constitutes a false representation of material fact.

75.     Mr. Kelly, as a partner in the BCC venture, owed a duty of care to Dr. Walsh and Dr. Wood.

76.     Mr. Kelly knew that his representation was false, or that it was made with such reckless disregard for the truth that knowledge of the falsity of the statement can be imputed to him.

77.     Mr. Kelly made the false representation for the purpose of defrauding Dr. Walsh and Dr. Wood, so that he could take the BCC concept and IP for himself and market it under a different name for his own gain and no one else's.

78.     Dr. Walsh and Dr. Wood suffered damages as a direct result of their reliance upon the misrepresentation, being deprived of months of revenue from sales of the BCC; control over the development and sale of the BCC; and a share of the profits garnered in the course of selling Bloodsmart.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Hold that Defendant Christopher Kelly made a false representation of material fact to Plaintiffs, and that they incurred damages as a direct result of their reliance on Defendant's false representation.

(2) Grant a judgement against Defendant Christopher Kelly in excess of Seventy-Five Thousand Dollars ($75,000) in compensatory and expectation damages, plus interest.

(3) Grant punitive damages against Defendant Christopher Kelly.

(4) Hold Defendant Christopher Kelly responsible for the costs of these proceedings, and the attorney's fees accrued by Plaintiffs.

(5) Grant such other and further relief as this Court deems appropriate.

## COUNT IV: NEGLIGENT MISREPRESENTATION
### (Christopher Kelly)

79.     Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

80.     Defendant Christopher Kelly told the other Partners on or around December 8th, 2017 that selling and marketing of the BCC through NBT was a temporary measure, and that the Partners would move operations into the control of an independent corporate entity after the product moved past the initial stage of development.

81.     Mr. Kelly's statement constitutes a negligent assertion of a false statement.

82.     Mr. Kelly, as a partner in the BCC venture, owed a duty of care to Dr. Walsh and Dr. Wood.

83.     Mr. Kelly intended for Dr. Walsh and Dr. Wood to act or rely upon his negligent assertion.

84.     Mr. Kelly knew that Dr. Walsh and Dr. Wood would likely rely upon his negligent assertion, which, if erroneous, would result in damages.

85.    Dr. Walsh and Dr. Wood took justifiable action in reliance upon the negligent assertion of Defendant, as evinced by the parties agreeing to temporarily market and sell the BCC through NBT and the Partners' use of IRS 1099 independent contractor forms linked to NBT.

86.    Dr. Walsh and Dr. Wood suffered damages as a result of their reliance upon Mr. Kelly's misrepresentation, being deprived of months of revenue from sales of the BCC; control over the development and sale of the BCC; and a share of the profits garnered in the course of selling Bloodsmart.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Hold that Defendant Christopher Kelly made a negligent representation of a false statement to Plaintiffs, and that they incurred caused by Defendant's negligence.

(2) Grant a judgement against Defendant Christopher Kelly in excess of Seventy-Five Thousand Dollars ($75,000) in compensatory and expectation damages, plus interest.

(3) Hold Defendant Christopher Kelly responsible for the costs of these proceedings, and the attorney's fees accrued by Plaintiffs.

(4) Grant such other and further relief as this Court deems appropriate.

## COUNT V: NEGLIGENCE – BREACH OF FIDUCIARY DUTY
### (Christopher Kelly)

87.    Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

88.    Defendant Christopher Kelly, as a partner in the BCC venture, and as proprietor of the company through which the BCC was sold, was engaged in a fiduciary relationship with Dr. Walsh and Dr. Wood.

89.    Mr. Kelly's appropriation of the BCC IP for himself, as well as his decision to market a virtually identical product under a different moniker, constitute a negligent breach his fiduciary duty to Dr. Walsh and Dr. Wood on at least four fronts: (1) Mr. Kelly usurped control of

the venture for himself; (2) Mr. Kelly stole shared BCC IP that the Partners worked together to develop; (3) in marketing the BCC under a new name, Mr. Kelly took for himself profits that should have been split amongst the Partners; (4) Mr. Kelly deprived the Dr. Walsh and Dr. Wood of a role in the decision-making process by unilaterally removing the BCC from the marketplace.

90.     Mr. Kelly's actions further constitute a negligent breach of the corporate opportunity doctrine, since he usurped, for personal benefit, business opportunities that rightfully belonged to the Partners as a collective entity.

91.     Dr. Walsh and Dr. Wood suffered harm as a direct result of Mr. Kelly's negligent breach of fiduciary duty, being deprived of months of revenue from sales of the BCC; control over the development and sale of the BCC; and a share of the profits garnered in the course of selling Bloodsmart.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Hold that Defendant Christopher Kelly was engaged in a fiduciary relationship with Plaintiffs, and that he negligently breached his fiduciary duties in the course of that relationship.

(2) Grant a judgement against Defendant Christopher Kelly in excess of Seventy-Five Thousand Dollars ($75,000) in compensatory and expectation damages, plus interest.

(3) Hold Defendant Christopher Kelly responsible for the costs of these proceedings, and the attorney's fees accrued by Plaintiffs.

(4) Grant such other and further relief as this Court deems appropriate.

### COUNT VI: INJUNCTIVE RELIEF
### (All Defendants)

92.     Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby expressly incorporate by reference the facts and allegations in ¶¶ 1-58 as if fully re-stated herein.

93.     Dr. Walsh and Dr. Wood possess a stake in the BCC concept and all BCC IP developed in the course of the Partners' work together.

94.     Dr. Walsh and Dr. Wood therefore have a right to the BCC IP and profits incurred marketing the BCC IP.

95.     Absent the granting of a Permanent Injunction, Mr. Kelly/NBT will continue to market the BCC IP for their gain alone via the Bloodsmart product.

96.     The injury this will incur on Dr. Walsh and Dr. Wood is irreparable, as the actions of Mr. Kelly/NBT are confusing consumers as to the differences between the BCC and Bloodsmart, a situation which grows worse by the day.

97.     If Mr. Kelly and NBT are allowed to continue to market the BCC IP, Dr. Walsh and Dr. Wood will also be deprived of any control over the use of their proprietary data to develop new products, which further constitutes irreparable harm.

98.     Finally, every day that Mr. Kelly markets the BCC IP as his own through NBT, Dr. Walsh and Dr. Wood are losing profits that are rightfully theirs per the terms of the Partnership Agreement, and there is no telling when or if they will be able to get these lost profits back.

99.     The benefits to Dr. Walsh and Dr. Wood in obtaining a permanent injunction are equal to or outweigh the potential harm which Mr. Kelly/NBT would incur were such an injunction to be granted, since granting a permanent injunction would simply reset the parties' relationship to the way it was prior to Mr. Kelly going incommunicado, maintaining the *status quo*.

100.    For the reasons delineated in ¶¶ 96-98, Dr. Walsh and Dr. Wood will suffer irreparable injury unless a permanent injunction is granted.

101.    The public interest is best served by the granting of a permanent injunction, as it supports the proposition that an individual in a partnership cannot unilaterally steal propriety information from other partners and market that information, basically unaltered, for his own gain.

WHEREFORE, Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., respectfully request that this Court:

(1) Issue an Order granting Plaintiffs a Permanent Injunction restraining Defendants Christopher Kelly and Nourish Balance Thrive, Inc.  from marketing, selling, or otherwise making use of the BCC IP without the express written approval of the other Partners.

(2) Issue an Order granting Plaintiffs a Permanent Injunction restraining Defendants Christopher Kelly and Nourish Balance Thrive, Inc. from further developing, selling, or licensing Bloodsmart.

(3) Issue an Order granting Plaintiffs a Permanent Injunction enjoining Defendants Christopher Kelly and Nourish Balance Thrive, Inc. to transfer the BCC IP into the control of an independent corporate entity managed by the Partners.

(4) Grant such other and further relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs Bryan Walsh, N.D., and Thomas Wood, B.M., B.Ch., Ph.D., hereby

demand a trial by jury on all issues triable by jury pursuant to Fed. R. Civ. P. Rule 38.

Respectfully submitted,

Jan I. Berlage (23937)
GOHN HANKEY & BERLAGE LLP
201 North Charles Street, Suite 2101
Baltimore, Maryland 21201
Tel.: (410) 752-1261
Fax.: (410) 752-2319
jberlage@ghsllp.com

*Attorney for Plaintiffs*

## VERIFICATION

We solemnly affirm under the penalties of perjury that the contents of the foregoing paper

are true to the best of our knowledge, information, and belief.

12/9/19
Date

Bryan Walsh, N.D.

Thomas Wood, B.M., B.Ch., Ph.D.